IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FRANK "DOE",<br><br>                              Plaintiff,<br><br>        v.<br><br>WM OPERATING, LLC d/b/a<br>MEADOWVIEW REHABILITATION AND<br>NURSING CENTER, *et al.*,<br><br>                              Defendants. | Case No. 17-2204 |

**BRIEF IN SUPPORT OF THE RESPONSE OF PLAINTIFF, FRANK "DOE," IN OPPOSITION TO THE MOTION OF DEFENDANTS, WM OPERATING LLC d/b/a MEADOWVIEW REHABILITATION AND NURSING CENTER, AND JOHN CHAPMAN, TO DISMISS PLAINTIFF'S COMPLAINT**

Plaintiff, Frank "Doe," hereby submits and files the instant Brief in Support of his Response in Opposition to the Motion of Defendants, WM Operating LLC d/b/a Meadowview Rehabilitation and Nursing Center, and John Chapman, to Dismiss Plaintiff's Complaint, and in support thereof, states as follows:

I.    **COUNTER-STATEMENT OF THE FACTS:**

Plaintiff is a gay man who was harassed and ultimately fired from his job on the basis of his sexual orientation and gender non-conformity. The Defendants ignore the facts pled in Plaintiff's Complaint which support a claim of gender stereotyping – that Plaintiff was discriminated against and harassed because of his failure to conform to how a man should speak, act, behave, and what he should be or do. Therefore, a recitation at length of the facts underlying this discrimination and harassment case is necessary.

Plaintiff alleges in his Complaint that he worked as the Defendants' Activities Director "for 1 year and 4 months before he was terminated" due to his sexual orientation. See Pltf.'s

Compl., at ECF No. 1, para. 48.  Right before Plaintiff's supervisor, John Chapman, was hired in

February 2016, a former "nurse supervisor under Mr. Chapman warned Doe that he should 'turn

down the gay' whenever he was going to be around Mr. Chapman."  <u>See id.</u> at para. 51.  Soon

after Mr. Chapman became Plaintiff's supervisor in February 2016,

> [Mr. Chapman] repeatedly mocked Doe by referring to him by the **female name**,
> 'Frances,' instead of Doe's real name, 'Frank.'  'Frank' is *not* short for 'Francis.'  When
> Mr. Chapman called Doe by the name, 'Frances,' Mr. Chapman **always raised the**
> **inflection of his voice like a woman.  The effeminate intonation was high-pitched**
> **and musical.**  Mr. Chapman referred to Doe as 'Frances' even after Doe repeatedly told
> [Mr. Chapman] to stop.

<u>See</u> Pltf.'s Compl., at ECF No. 1, para. 53-55 (emphasis added).

At one point, "Mr. Chapman asked Doe during a one-on-one whether Doe thought that

Mr. Chapman did not like him," "Doe responded that he believed Mr. Chapman had a problem

with gay people in general," and "Mr. Chapman raised his hand in the air, dropped it in his lap,

and said, **'Frances!' in a high-pitched, dramatic fashion**."  <u>See id.</u> at para. 57 (emphasis

added).  Other employees told Plaintiff that the supervisor, Mr. Chapman, was just a "**closet**

**case**," meaning that he was gay but not 'out' about his sexuality like the Plaintiff.  <u>See id.</u> at

para. 56.  Thereafter, Plaintiff alleges that Mr. Chapman harassed him with the female name,

"Frances," including on or about September 6, 2016.  <u>See id.</u> at para. 58-59.

On September 22, 2016, Plaintiff was fired by Mr. Chapman.  <u>See id.</u> at para. 60.  Then,

"[o]n October 7, 2016, the Unemployment Compensation Board of Review found that Doe "did

not knowingly or intentionally violate the employer's policies" and that "there is no competent

evidence in the record to support a finding of wilful misconduct" against Doe.  <u>See id.</u> at para.

65.

With respect to pretext, Plaintiff alleges that Defendants "routinely offered progressive

discipline, including a verbal warning, three (3) written warnings (*i.e.*, three strikes), a final

written warning, and a suspension," but that "Defendants did not offer these to Doe." <u>See id.</u> at para. 63. Instead, the Defendants simply fired Doe the day after the alleged incident. <u>See id.</u> Also, Doe can point to a similarly situated heterosexual female employee who engaged in more serious misconduct – yelling at another employee, saying that the employee was a "bitch," and then slamming her office door so hard it came off the hinges. <u>See id.</u> at para. 64. However, this similarly situated employee was not terminated like Doe. <u>See id.</u> Finally, Plaintiff Doe claims that the employer's reason for terminating him (allegedly sleeping on the job) is exaggerated and totally false. <u>See id.</u> at para. 66. Doe claims, to the contrary, that he was an enthusiastic employee beloved by the Meadowview residents and patients he served. <u>See id.</u> at para. 48.

Plaintiff seeks lost wages for his termination and emotional distress damages due to the harassment. <u>See</u> <u>ad damnum</u> clause at pp. 11-12. With respect to the emotional distress damages, Plaintiff – an effeminate gay man – seeks recovery for pain and suffering that included "**suppressing his gender expression to avoid appearing gay**." <u>See id.</u> Additionally, in Plaintiff's original administrative charge, he elaborated that he was "forced to suppress and hide being gay, **alter my gender to conform to my sex, and suppress any gender non-conforming behavior because of the feeling of a need to pass to prevent future discrimination and harassment**." <u>See</u> PCHR Complaint, at Ex. "EE," para. 36.

## II.  LEGAL ARGUMENT:

### A.  Plaintiff Has Pled Viable Sex Discrimination Claims Under Title VII and the Pennsylvania Human Relations Act ("PHRA").[1]

#### 1.  Anti-gay discrimination is *always* and *necessarily* a form of sex discrimination.

Defendants argue that Plaintiff cannot recover for sex discrimination simply because he is also gay.  However, this is an incorrect recitation of the current state of the law.  Sexual orientation discrimination is always and necessarily a form of sex discrimination because:

   *(1) Plaintiff Doe was discriminated against and harassed because he is male, since comparatively or counterfactually had he been female (controlling for everything but his sex), Plaintiff Doe would not have been subject to discrimination or harassment;*

   *(2) Applying the associational theory of discrimination, Plaintiff Doe was discriminated against and harassed because of his intimate association with someone of the same sex;*

   *(3) Plaintiff Doe was discriminated against and harassed based on gender stereotypes because he failed to conform with heterosexuality which is the societal norm of what a male should be or do, and how he should act or behave.*

These three different approaches or frameworks can, in reality, be encapsulated into a single, common question:  but for Plaintiff Doe's sex, would he have been subject to the discrimination and harassment of which he complains?  The answer is no, Plaintiff Doe would not have been discriminated against or harassed but for his sex.

The Equal Employment Opportunity Commission's ("EEOC's") recent decision in Baldwin v. Foxx, Appeal No. 0120133080 (EEOC July 15, 2015), is highly persuasive as the

---

[1] The same analysis applies to the PHRA as applies to Title VII.  See Wilkerson v. New Media Tech. Charter Sch., Inc., 522 F.3d 315, 318-19 (3d Cir. 2008).

4

EEOC is the administrative agency that enforces Title VII.  The <u>Baldwin</u> decision is attached hereto as Exhibit "A."  In <u>Baldwin</u>, the plaintiff alleged that he was not promoted "because he is gay."  <u>Baldwin</u>, Ex. "A," at p. 2.  The EEOC allowed the plaintiff to bring a "sexual orientation" discrimination claim under the rubric of "sex" discrimination because "sexual orientation is inherently a sex-based consideration, and an allegation of discrimination based on sexual orientation is necessarily an allegation of sex discrimination under Title VII."  <u>See id.</u> at p. 6. <u>Baldwin</u> concluded that "sexual orientation as a concept cannot be defined or understood without reference to sex."  <u>See id.</u>  Specifically, <u>Baldwin</u> pointed out that "[d]iscrimination on the basis of sexual orientation is premised on sex-based preferences, assumptions, expectations, stereotypes, or norms."  <u>See id.</u>

<u>Baldwin</u> explained that "[s]exual orientation discrimination also is sex discrimination because it necessarily involves discrimination based on gender stereotypes" in that "sexual orientation discrimination and harassment are often, if not always, motivated by the desire to enforce heterosexually defined gender norms."  <u>See id.</u> at pp. 9, 11 (internal citation omitted).  In other words, "[t]he harasser may discriminate against an openly gay co-worker, or a co-worker that he perceives to be gay, whether effeminate or not, because he thinks, 'real' men should date women, and not other men."  <u>See id.</u> at p. 11 (internal citation omitted).

<u>Baldwin</u> also explained that an LGBT person complaining of "discrimination on the basis of sexual orientation is alleging that his or her employer took his or her sex into account by treating him or her differently for *associating* with a person of the same sex."  <u>See id.</u> at p. 8 (emphasis in original).  By analogy, <u>Baldwin</u> pointed out that "[i]n applying Title VII's prohibition of race discrimination, courts and the Commission have consistently concluded that the statute prohibits discrimination based on an employee's association with a person of another

5

race, such as an interracial marriage . . . ."  See id.  Baldwin's holding was broad and inclusive:
"An employee could show that the sexual orientation discrimination he or she experienced was
sex discrimination because it involved treatment that would not have occurred but for the
individual's sex; was based on the sex of the person(s) the individual associates with; and/or
because it was premised on the fundamental sex stereotype, norm, or expectation that individuals
should be attracted only to those of the opposite sex."  See id. at page 14.

The Seventh Circuit Court of Appeals' *en banc* decision in Hively v. Ivy Tech
Community College of Indiana, 853 F.3d 339 (7th Cir. 2017), decided recently on April 3, 2017,
follows the same framework and is highly persuasive.  In Hively, the plaintiff alleged she was
not promoted, and then did not have her employment contract renewed, because she was "openly
lesbian."  Id. at 341.  The employer moved to dismiss the plaintiff's complaint under Federal
Rule of Civil Procedure 12(b)(6), argued that sexual orientation discrimination did not constitute
sex discrimination, and the trial court granted the motion.  Id.  However, the Seventh Circuit in
Hively reversed, finding it was "wrong to dismiss Hively's complaint for failure to state a
claim."  Id. at 352.  The Seventh Circuit ruled "that discrimination on the basis of sexual
orientation is a form of sex discrimination."  Id. at 341.

The Hively court took note that completely absent in "the debate over the proper
interpretation of the scope of Title VII's ban on sex discrimination is the United States Supreme
Court," specifically a number of binding decisions decided by the Supreme Court in recent years.
Id. at 342.  First, Hively pointed out that the Supreme Court held in Price Waterhouse v.
Hopkins, 490 U.S. 228 (1989), that "the practice of gender stereotyping falls within Title VII's
prohibition against sex discrimination."  Hively, 853 F.3d at 342.  In Price Waterhouse, the
Supreme Court recognized that, "in forbidding employers to discriminate against individuals

because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989).

Additionally, Hively addressed the Supreme Court's decision in Oncale v. Sundowner Offshore Services, 523 U.S. 75 (1998), which found "that it makes no difference if the sex of the harasser is (or is not) the same as the sex of the victim." Hively, 853 F.3d at 342. As for the argument that same-sex harassment is not within the definition of sex discrimination, the Oncale Court reasoned that "male-on-male sexual harassment was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provision of our laws rather than the principal concerns of our legislators by which we are governed." Hively, 853 F.3d at 344 (quoting Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 79-80 (1998)).

Finally, Hively relied heavily on the Supreme Court's decision in Loving v. Virginia, 388 U.S. 1 (1967), which found miscegenation to be a form of race discrimination. Hively, 523 F.3d at 342. The Hively court reasoned that there would be "a sharp tension between a rule that fails to recognize that discrimination on the basis of the sex with whom a person associates is a form of sex discrimination, and the rule, recognized since Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L. Ed. 2d 1010 (1967), that discrimination on the basis of the race with whom a person associates is a form of racial discrimination." Hively, 523 F.3d at 342. Specifically, the plaintiff in Hively argued that Loving v. Virginia "protect[s] her right to associate intimately with a person of the same sex." Hively, 523 F.3d at 345.

The <u>Hively</u> court reasoned that it must "bring our law into conformity with the Supreme Court's teachings" identified above. <u>Hively</u>, 523 U.S. at 343. The <u>Hively</u> court stated that it needed to "apply the relevant Supreme Court decisions to the statute to the best of our ability" and rest its decision on "the Supreme Court's authoritative interpretations, not what someone thought [Title VII] meant one, ten, or twenty years ago." <u>Id.</u> at 350, 350 n.6.

The <u>Hively</u> court ruled that the plaintiff would not have been discriminated against but for her sex, reasoning that "the counterfactual we must use is a situation in which Hively is a man, but everything else stays the same: in particular, the sex or gender of the partner." <u>Id.</u> at 345. The court considered sexual orientation discrimination to be "paradigmatic sex discrimination" because "if [Hively] had been a man married to a woman (or living with a woman, or dating a woman) and everything else had stayed the same, Ivy Tech would not have refused to promote her and would not have fired her." <u>Id.</u> The <u>Hively</u> court held emphatically that the case "represents the ultimate case of failure to conform to the female stereotype (at least as understood in a place such as modern America, which views heterosexuality as the norm and other forms of sexuality as exceptional): she is not heterosexual." <u>Id.</u> at 346. The court stated broadly that "[a]ny discomfort, disapproval, or job decision based on the fact that the complainant – woman or man – dresses differently, speaks differently, or **dates or marries a same-sex partner**, is a reaction purely and simply based on sex." <u>Id.</u> at 347 (emphasis added). The court further stated that "it is actually impossible to discriminate on the basis of sexual orientation without discriminating on the basis of sex." <u>Id.</u> at 351.

<u>Hively</u> also ruled, "under the associational theory" of <u>Loving v. Virginia</u>, that "[i]t is now accepted that a person who is discriminated against because of the protected characteristic of one with whom she associates is actually being disadvantaged because of her own traits." <u>Hively</u>,

523 F.3d at 347.  The court reasoned that "[i]f we were to change the sex of one partner in a lesbian relationship, the outcome would be different.  This reveals that the discrimination rests on distinctions drawn according to sex."  Id. at 349.  Therefore, in light of the Seventh Circuit's recent decision in Hively, Title VII clearly extends to sexual orientation discrimination because sexual orientation discrimination is always and necessarily a form of sex discrimination.  See also Hamzah v. Woodman's Food Mkt., Inc., No. 16-3943, 2017 U.S. App. LEXIS 10299 *1, *7 (7th Cir. June 9, 2017) (same).

Finally, two recent (2) cases out of the Eastern and Western Districts of Pennsylvania are directly on point.  In a recent case out of the Western District of Pennsylvania, decided on November 4, 2016, the court ruled that "Title VII's 'because of sex' provision prohibits discrimination on the basis of sexual orientation."  E.E.O.C. v. Scott Med. Health Ctr., P.C., 217 F. Supp. 3d 834, 839 (W.D. Pa. 2016).  In Scott Medical, a case similar to the instant case, "a gay male" was "allegedly constructively discharged . . . due to an allegedly sexually hostile work environment perpetuated by . . . [a] manager."  Id. at 835.  Specifically, the employee was called "fag, faggot, fucking faggot, and queer," "fucking queer can't do your job," "I always wondered how you fags have sex," "I don't understand how you fucking fags have sex," and "Who's the butch and who is the bitch?"  Id. at 836.  The court denied the employer's motion to dismiss based on the argument that Title VII does not extend to discrimination on the basis of sexual orientation.  Id.

The court in Scott Medical specifically rejected *both* of the decisions also relied on by the Defendants in the instant case, Bibby v. Philadelphia Coca Cola Bottling Company, 260 F.3d 257 (3d Cir. 2001) and Prowel v. Wise Business Forms, Inc., 579 F.3d 285 (3d Cir. 2009).  Scott Medical, 217 F. Supp. 3d at 839.  The court pointed out that the Bibby court "was not presented

with the same arguments or analytical framework as that put forth . . . in this case" and did not even "make any argument that sexual orientation discrimination is sex stereotyping." <u>Scott Medical</u>, 217 F. Supp. 3d at 841.  The court held that "Title VII precedent relied on by the Court of Appeals in <u>Bibby</u> either predated <u>Price Waterhouse</u> or contained little to no analysis, merely accepting as a given that Title VII did not cover sexual orientation discrimination," and that "since the publications of <u>Bibby</u> and <u>Prowel</u>, district courts throughout the country have endorsed an interpretation of Title VII that includes a prohibition on discrimination based on sexual orientation." <u>Scott Medical</u>, 217 F. Supp. 3d at 841.  The court reasoned, instead, that "[t]here is no more obvious form of sex stereotyping than making a determination that a person should conform to heterosexuality," and that "[f]orcing an employee to fit into a gendered expectation – whether that expectation involves physical traits, clothing, mannerisms, or sexual attraction – constitutes sex stereotyping." <u>Id.</u>  In short, the court in <u>Scott Medical</u> ruled that "discrimination on the basis of sexual orientation is, at its very core, sex stereotyping plain and simple; there is no line separating the two." <u>Id.</u>  The court ended its opinion by reasoning, "That someone can be subjected to a barrage of insults, humiliation, hostility and/or changes to the terms and conditions of their employment, based upon nothing more than the aggressor's view of what it means to be a man or a woman, is exactly the evil Title VII was designed to eradicate." <u>Id.</u> at 842.

The court in <u>Scott Medical</u> also found "compelling" the "arguments that the same standard and reasoning that applies when examining cases involving interracial associations also applies in this context." <u>Id.</u> at 840 n.5.  The <u>Scott Medical</u> court therefore distinguished <u>Bibby</u> further because "the [p]laintiff in <u>Bibby</u> failed to raise the question of how the impact of interracial association case law could impact the analysis . . . ." <u>Id.</u> at 841.

Relying on <u>Scott Medical</u>, a recent case out of this jurisdiction – the Eastern District of Pennsylvania – also involved the denial of an employer's motion to dismiss on the basis that sexual orientation discrimination constitutes sex discrimination.  See <u>Ellingsworth v. Hartford Fire Ins. Co.</u>, No. 16-3187, 2017 U.S. Dist. LEXIS 42601 (E.D. Pa. Mar. 23, 2017) (Stengel, J.). In <u>Ellingsworth</u>, the plaintiff's supervisor told the plaintiff she "dresses like a dyke," had a "lesbian tattoo," and told the plaintiff's coworkers that she "was a lesbian."  <u>Id.</u> at *2.   The <u>Ellingsworth</u> court rejected the defendant's argument that "plaintiff failed to state a claim for relief because Title VII does not prohibit discrimination based on sexual orientation[,] [b]ecause Title VII prohibits gender stereotyping and discrimination 'because of sex.'"  <u>Id.</u> at *6-7.  The court pointed out that the "defendant ignores the true nature of the alleged discrimination complained of in this case."  <u>Id.</u> at *13.  As a result, the court considered that the "defendant's argument lacks merit."  <u>Id.</u> at *7.  The court reasoned that "[t]he complaint clearly shows that Ms. Ellingsworth did not fit her employer's view of what it means to be a woman" and that the supervisor's "alleged comments and criticisms present a textbook example of gender stereotyping."  <u>Id.</u> at *12, *14.

As stated above, Defendants rely on older decisions, <u>Bibby v. Philadelphia Coca Cola Bottling Company</u>, 260 F.3d 257 (3d Cir. 2001); <u>Prowel v. Wise Business Forms, Inc.</u>, 579 F.3d 285 (3d Cir. 2009); and <u>Pagan v. Gonzalez</u>, 430 Fed. Appx. 170 (3d Cir. 2011).

<u>Bibby</u> reasoned, in particular, that "Congress has repeatedly rejected legislation that would extend Title VII to cover sexual orientation."  <u>Bibby v. Phila. Coca Cola Bottling Co.</u>, 260 F.3d 257, 261 (3d Cir. 2001).  <u>Prowel</u> also held that sexual orientation discrimination was not sex discrimination because of "Congress's decision not to make sexual orientation discrimination cognizable under Title VII."  <u>Prowel v. Business Wise Forms</u>, 579 F.3d 285, 292 (3d Cir. 2009).

11

However, following both of these cases, the congressional inaction argument has been consistently rejected by the Supreme Court and the Third Circuit on the basis that "the Supreme Court has ruled that 'congressional inaction lacks persuasive significance because several equally tenable inferences can be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change.'" Baldwin, Ex. "A," at p. 13 (quoting Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 650 (1990)); see also Scott Medical, 217 F. Supp. 3d at 842 ("Third Circuit decisions have questioned the value of reliance on Congressional inaction") (quoting In re Visteon Corp., 612 F.3d 210, 230 (3d Cir. 2010) ("Evidence of congressional inaction is generally entitled to minimal weight in the interpretive process")). In fact, as the Seventh Circuit in Hively reasoned, the proposal and rejection of subsequent legislation protecting LGBT employees could just as well "have caused some in Congress to think that legislation is needed to carve sexual orientation *out* of the statute, not to put it *in.*" Hively, 853 F.3d at 344 (emphasis in original).

The final case cited by Defendants, Pagan v. Gonzalez, 430 Fed. Appx. 170 (3d Cir. 2011), is simply reported in the Federal Appendix, is not precedential, and does not bind this Court in any way. See Third Circuit I.O.P. 5.7. Nonetheless, the Pagan case does not involve any meaningful analysis or reasoning of its own. See Pagan v. Gonzalez, 430 Fed. Appx. 170, 172 (3d Cir. 2011). Pagan simply holds, without more (and using fallacious *ipso facto* logic), that sexual orientation discrimination is not protected as sex discrimination under Title VII, because the discrimination related to sexual orientation and not sex. Specifically, the Pagan court held:

> The District Court concluded that Pagan actually claimed that she was being discriminated against based on sexual orientation, as opposed to gender stereotyping. In coming to this conclusion, the District Court relied on the language of the complaint, as well as the factual allegations as to offensive comments relating to her sexual orientation,

12

and the absence of any evidence to show that the discrimination was based on Pagan's acting in a masculine manner.  Our review leads to the same result.

Pagan, 430 Fed. Appx. at 172.

A review of the district court's decision in Pagan will reveal that the district court decision is equally devoid of any meaningful analysis or reasoning regarding the argument that sexual orientation is always and necessarily sex discrimination.  The Pagan case does not address any of the arguments and frameworks presented by Plaintiff Doe in the instant case.  The district court in Pagan relies on Bibby and Prowel for the same *ipso facto* argument that gays and lesbians are not protected from sexual orientation discrimination as sex discrimination, because sexual orientation discrimination is not sex discrimination.

The district court in Pagan stated that it would not "permit Plaintiff to bootstrap protection for sexual orientation into Title VII by repackaging her sexual orientation claim as gender stereotyping."  Pagan v. Holder, 741 F. Supp. 2d 687, 695 (D.N.J. 2010).  In fact, the district court in Pagan went so far as to excise all of the sexual-orientation based comments ("dyke" and "lesbian") from the case, and then found that the remaining comment that the plaintiff could not be a personal trainer because she was a woman was not "severe or pervasive" enough in and of itself for a sexual harassment claim.  Id. at 698.  The essence of such an argument is that LGBT people cannot recover for sex discrimination or harassment under the law, simply because they are gay.  This Court should not give sanction or effect to such inequality under the law.

Bibby, Prowel, and Pagan were *all* decided before Baldwin, Hively, Scott Medical, and Ellingsworth.  Bibby, Prowel, and Pagan also do *not* address in any way the interracial association argument, the counterfactual argument that but for his sex the Plaintiff would not

13

have been discriminated against, nor the argument that failure to conform to the norm of heterosexuality is inherently a failure to conform to a gender stereotype.

In contrast to the cases cited in Defendants' Motion, district courts across the country are consistently ruling that Title VII's prohibition on sex discrimination protects employees from discrimination based on their sexual orientation.  See, e.g., Philpott v. New York, 16 Civ. 6778, 2017 U.S. Dist. LEXIS 67591 (S.D.N.Y. May 3, 2017); Boutillier v. Hartford Pub. Sch., No. 3:13-CV-01303, 2016 U.S. Dist. LEXIS 159093, 2016 WL 6818348 (D. Conn. Nov. 17, 2016); Winstead v. Lafayette Cnty. Bd. of Cnty. Comm'rs, 197 F. Supp. 3d 1334, 2016 WL 3440601 (N.D. Fla. 2016); Isaacs v. Felder Servs., LLC, 143 F. Supp. 3d 1190 (M.D. Ala. 2015); see also Videckis v. Pepperdine Univ., 150 F. Supp. 3d 1151 (C.D. Cal. 2015) (Title IX).

In addition, gender identity claims brought by transgender people have been found to state cognizable sex discrimination claims.  See, e.g., Rosa v. Park W. Bank & Tr. Co., 214 F.3d 213, 215-16 (1st Cir. 2000) (Equal Credit Opportunity Act); Schwenk v. Hartford, 204 F.3d 1187, 1201-02 (9th Cir. 2000) (Gender Motivated Violence Act); Barnes v. City of Cincinnati, 401 F.3d 729 (6th Cir. 2005); Smith v. City of Salem, Ohio, 378 F.3d 566 (6th Cir. 2004); Fabian v. Hosp. of Cent. Conn., 172 F. Supp. 3d 509 (D. Conn. 2016).

Most importantly, Bibby, Prowel, and Pagan were also *all* decided before the Supreme Court overturned discriminatory bans on same-sex marriage nationwide in Obergefell v. Hodges, 135 S.Ct. 2584, 192 L. Ed. 2d 609 (2015).  In the recent Obergefell case, the Supreme Court rejected discrimination against gays and lesbians with respect to marriage, and reasoned that "new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed or unchallenged."  Obergefell, 135 S.Ct. at 2590.  The Supreme Court cautioned that "the nature of injustice is that we may not always see it

in our times," <u>Obergefell</u>, 135 S. Ct. at 2598, and that "[i]f rights were defined by who exercised them in the past, then received practices could serve as their own continued justification and new groups could not invoke rights once denied.  This Court has rejected that approach . . . with respect to the . . . rights of gays and lesbians."  <u>Id.</u> at 2602.  The Supreme Court also ruled in 2003, in the case of <u>Lawrence v. Texas</u>, 539 U.S. 558 (2003), that state laws outlawing "sodomy" were unconstitutional, reasoning that, "As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom."  <u>Lawrence v. Texas</u>, 539 U.S. 558, 578-79 (2003).

Accordingly, <u>Bibby</u>, <u>Prowel</u>, and <u>Pagan</u> should be rejected as they no longer represent the current state of the law – equality for gays and lesbians nationwide.  To the extent that the <u>Bibby</u> and <u>Prowel</u> decisions are precedential, which Plaintiff contends they are not any longer, it must be pointed out that any judicial interpretation of the law excluding LGBT people from protection, simply because they are gay, would be outright unconstitutional itself.  Respectfully, this Honorable Court has a duty to apply the Supreme Court's precedent, and not create inequality or injustice under the law.

This Court must rule in a manner consistent with <u>Obergefell</u>.  <u>Obergefell</u> expressly recognized, as a matter of Constitutional law, that LGBT people enjoy a guarantee of fundamental liberty in forming intimate relationships and having affectional interests.  LGBT people also enjoy equal protection of the law, and the freedom of expression to be their authentic and true selves.[2]  Who would want to come out if you can be fired from your job, be unable to

---

[2] <u>Obergefell v. Hodges</u>, 135 S.Ct. 2584, 192 L. Ed. 2d 609 (2015), recognized the fundamental right of gays and lesbians to marry their partners, be treated equally under the law, and to be treated with dignity, despite the fact that the sex of their partner is the same.  <u>Lawrence v. Texas</u>, 539 U.S. 558 (2003) involved the right to privacy for consensual same-sex intercourse under the Fourteenth Amendment, and overruled prior Supreme Court precedent of <u>Bowers v. Hardwick</u>, 478 U.S. 186 (1986), which previously permitted states to outlaw sodomy.  Plaintiff Doe also directs this Court to fairly recent Supreme Court precedent recognizing and developing the rights of LGBT people, in cases such as <u>Romer v. Evans</u>, 517 U.S. 620 (1996) (state may not pass constitutional amendment denying

gain steady employment or work, and improve your lot in life simply because of who you are? Who would want to be gay if you can be subjected to harassment with impunity under the law simply because of who you love?  How long must LGBT people wait for justice?

### 2. Alternatively, Plaintiff has pled a valid "gender stereotyping" / "gender non-conformity" claim, notwithstanding the fact that he also happens to be gay.

Alternatively, the instant case is distinguishable from Bibby, Prowel, and Pagan because Plaintiff Doe has sufficiently alleged that he was subjected to gender stereotyping or gender non-conformity discrimination, in addition to discrimination based on his sexual orientation. However, Plaintiff should be permitted to recover for sex discrimination in the form of gender stereotyping, just like any other litigant, *notwithstanding* the fact that he is gay.

In short, it is irrelevant whether the gender stereotyping results from the fact that Plaintiff is also gay, so long as he did experience gender stereotyping.  In fact, in the Prowel case, cited by Defendants in the instant Motion to Dismiss, the Third Circuit expressly held that an employer "cannot persuasively argue that because Prowel is homosexual, he is precluded from bringing a gender stereotyping claim." Prowel, 579 F.3d at 292.  The Third Circuit affirmed the trial court's ruling that "once a plaintiff shows that harassment is motivated by sex, it is no defense that it may also have been motivated by anti-gay animus." Prowel, 579 F.3d at 289 (citing Dist. Ct. Op., at 6, and Bibby, 260 F.3d at 265); see also E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, No. 14-13710, 2015 U.S. Dist. LEXIS 174621 *1, *9-10 (E.D. Mich. Sept. 24, 2015) (reasoning that "it is irrelevant whether the alleged gender-stereotyping resulted from the fact that [the plaintiff] is actually transgender"); Smith v. City of Salem, Ohio, 378 F.3d 566, 575

---

municipalities the right to protect LGBT people, under the Fourteenth Amendment's Equal Protection Clause), and Windsor v. United States, 133 S. Ct. 2675 (2013) (overturning the Defense of Marriage Act ("DOMA") which denied gays and lesbians with same-sex partners the fundamental rights and liberties guaranteed by the Equal Protection Clause of the Fifth Amendment, after nearly two decades – 20 years – of discrimination under the law and throughout the entire United States Code).

(6th Cir. 2004) ("[s]ex stereotyping based on a person's gender non-conforming behavior is impermissible discrimination, irrespective of the cause of that behavior; a label, such as 'transsexual,' is not fatal to a sex discrimination claim where the victim has suffered discrimination because of his or her gender non-conformity").

Therefore, in this case, the court need not necessarily decide whether Title VII or the PHRA also bars discrimination on the basis of sexual orientation, because the Plaintiff states a claim under the gender stereotyping theory regardless. For example, the evidence that Plaintiff was subjected to gender stereotyping consisted of Plaintiff being constantly misgendered by his supervisor (literally "**mocked" with a "female name, 'Frances'"**) because he was effeminate and openly gay. See Pltf.'s Compl., at ECF No. 1, at para. 53. This occurred even *after* the Plaintiff told his supervisor to stop the name-calling because it was homophobic. See id. at para. 57. The manner in which the supervisor pronounced the female name, "Frances!," suggested Plaintiff Doe spoke, acted, and behaved like a woman, and/or that being LGBT meant by definition that one must speak, act, or behave like a woman. Specifically, Plaintiff Doe alleges the supervisor called him a female name and "**raised the inflection of his voice like a woman. The effeminate intonation was high-pitched and musical.**" See id. at para. 54. On another occasion, the supervisor's intonation of the name, "Frances!" was "**dramatic.**" See id. at para. 57. In fact, in Prowel, the case relied upon by Defendants in their Motion to Dismiss, the Third Circuit allowed the plaintiff, an "effeminate man," to pursue a claim of gender stereotyping because he was harassed, in part, for having a high-pitched voice. Prowel, 579 F.3d at 286-87, 291. Equally so, if the harassing supervisor himself mocks an effeminate or openly gay male employee with a female name, in a high-pitched voice (as is the case here), such conduct clearly constitutes gender stereotyping. The Third Circuit in Prowel further recognized that, just

because the plaintiff was harassed because of his sexual orientation, "this does not vitiate the possibility that [the plaintiff] was also harassed for his failure to conform to gender stereotypes." Id. at 292.

A former colleague of Plaintiff and also of the harassing supervisor also told Plaintiff around the time that the supervisor was starting the job that Plaintiff should "**turn down the gay.**" See Pltf.'s Compl., at ECF No. 1, at para. 57. This is a suggestion that Doe should act and behave both less effeminate and less openly gay, should not be effeminate or openly gay, should not do effeminate or openly gay things, and is an encouragement for Doe to conform to the male stereotype in how he acted or behaved around the supervisor. This is the very definition of gender stereotyping. If this conduct is not a form of gender stereotyping, what is?

Other employees told Plaintiff that the supervisor, Mr. Chapman, was just a "**closet case**," an offensive term meaning the harassing supervisor was gay but not 'out' – in contrast to Plaintiff who was openly gay or 'out' about his sexuality. See id. at para. 56. In fact, Plaintiff Doe even alleged that, to prevent the harassment, he started to conform to gender stereotypes including "**suppressing his gender expression to avoid appearing gay.**" See Pltf.'s Compl., ECF No. 1, *ad damnum* clause at pp. 11-12. In Plaintiff's original administrative charge, he elaborated that he was "forced to suppress and hide being gay, **alter my gender to conform to my sex, and suppress any gender non-conforming behavior because of the feeling of a need to pass to prevent future discrimination and harassment**." See PCHR Complaint, at Ex. "EE," para. 36.

Despite Defendants' suggestion to the contrary, Doe has, in fact, pled that he was mistreated because he was an *effeminate* gay man. Harassment of Plaintiff Doe because he did not conform to the stereotype of what a 'real man' should be is exactly the evil that Title VII's

18

prohibition on sex stereotyping was designed to eradicate.  Therefore, Plaintiff Doe has

sufficiently alleged discrimination because of gender stereotyping or gender non-conformity,

notwithstanding his sexual orientation.

### B.     Plaintiff Has Pled a Viable Claim of Retaliatory Discharge Under Title VII.

To establish a *prima facie* case of retaliation, the "plaintiff must show (1) that he engaged

in a protected activity; (2) that he was discharged subsequent to or contemporaneously with such

activity; and (3) that a causal link exists between the protected activity and the discharge." Jalil v.

Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989).  To demonstrate that the plaintiff engaged in a

protected activity, the "plaintiff need not prove the merits of the underlying discrimination

complaint, but only that he was acting under a good faith, reasonable belief that a violation

existed." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996).

"[A] plaintiff may rely on a broad array of evidence to demonstrate a causal link between

his protected activity and the adverse action taken against him." Marra v. Phila. Housing Auth.,

497 F.3d 286, 302 (3d Cir. 2007) (citation omitted).  For example, temporal proximity together

with (1) intervening antagonism, or (2) a pretextual reason for discharge, can be sufficient to

establish causation for purposes of a retaliatory discharge claim. See Betz v. Temple Health Sys.,

No. 15-cv-00727, 2016 WL 147155 *1, *8-9, *11 (E.D. Pa. Jan. 13, 2016) (Pappert, J.)

("statements or inconsistencies" plus temporal proximity sufficient); see also Zelinski v. Pa. State

Police, 108 Fed. Appx. 700, 707 (3d Cir. 2004) (timing plus "pretextual reasons for the adverse

employment action" sufficient); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir.

2000) ("timing plus other evidence" sufficient); Schellenberger v. Summit Bancorp, Inc., 318 F.3d

183, 189 (3d Cir. 2003) (same).  However, "[i]t is important to emphasize that it is causation, not

temporal proximity or evidence of antagonism, that is an element of plaintiff's *prima facie* case,

and temporal proximity or antagonism merely provides an evidentiary basis from which an inference can be drawn." Kisner v. Defazio, No. 07-0788, 2009 U.S. Dist. LEXIS 117159 *1, *17-18 (W.D. Pa. Nov. 4, 2009). Thus, temporal proximity plus intervening antagonism, or temporal proximity plus pretext, are only two (2) ways to demonstrate a causal link for purposes of a retaliation claim; they are not the *exclusive* means of demonstrating causation.

> **1.    Plaintiff has demonstrated temporal proximity of about four (4) months <u>plus</u> intervening antagonism consisting of being repeatedly misgendered as "Frances!" in a high-pitched, dramatic tone of voice.**

Here, Plaintiff can show temporal proximity of about four (4) months plus intervening antagonism. Plaintiff alleges that even after he repeatedly told the supervisor not to call him "Frances!," and also after Plaintiff Doe complained to the supervisor in May 2016 that Doe believed this behavior was homophobic, the supervisor continued to be antagonistic by misgendering the Plaintiff with "Frances!" "from the time period of May 2016 through on or about September 6, 2016." See Pltf.'s Compl., at ECF No. 1, at para. 95, 97-98. On one occasion, on or about September 6, 2016 – the *same month* and *16 days before* Plaintiff was terminated – Plaintiff was openly misgendered with "Frances!" at a "holiday staff barbecue" to embarrass Plaintiff Doe conspicuously in front of his coworkers. See id. at para. 99. Before the May 2016 complaint, the Plaintiff alleged that he would tell the supervisor to stop calling him "Frances!;" however, the supervisor called the Plaintiff "Frances!" "repeatedly" despite his objections. See id. at para. 93.

This is sufficient to demonstrate intervening antagonism between the time period of Plaintiff's initial requests for the harasser to stop the harassment, the complaint to Plaintiff's supervisor in May 2016, and the alleged incident on September 21, 2016 leading to Doe's termination on September 22, 2016.

**2.      Plaintiff has demonstrated temporal proximity of about four (4) months <u>plus</u> evidence of pretext.**

Alternatively, Plaintiff has demonstrated temporal proximity of about four (4) months plus evidence of pretext.  Inconsistencies in the employer's proffered reason for discharge might be one way to establish pretext, but this is not the only way.  For example, "[i]t is well established that a plaintiff alleging employment discrimination may establish pretext by showing 'that the employer treated other, similarly situated persons not of his protected class more favorably.'"  <u>Hodzak v. Latrobe Specialty Steel Co.</u>, 451 Fed. Appx. 238, 242 (3d Cir. 2011) (quoting <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994)).  Pretext can also be shown where there is a deviation from company policy or standard office protocol in terminating an employee. <u>See</u> <u>Hillegass v. Borough of Emmaus</u>, No. 01-CV-5833, 2003 U.S. Dist. LEXIS 10771 *1, *20-21 (E.D. Pa. June 25, 2003) (J.M. Kelly, J.); <u>see also</u> <u>Poff v. Prudential Ins. Co.</u>, 911 F. Supp. 856, 861 (E.D. Pa. 1996) (Joyner, J.) ("an employer's failure to follow procedure assists a plaintiff's [pretext] case if such violation, in conjunction with other evidence (such as evidence showing that the policy was disparately applied), tends to show that the proffered reason is not credible"); <u>Goosby v. Johnson & Johnson Med., Inc.</u>, 228 F.3d 313, 322 (3d Cir. 2000); <u>Rivers v. Southeast Mo. Cmty. Treatment Ctr.</u>, 133 F.3d 616, 620-21 (8th Cir. 1998) (deviation from policy amid backdrop of racial animus sufficient to establish pretext).

Specifically, the Plaintiff has identified the following evidence in his Complaint:  (1) deviation from standard office protocol, policies, and procedures since Plaintiff was terminated the day after the alleged incident but not "offered progressive discipline – a verbal warning, three (3) written warnings (*i.e.*, three strikes), a final written warning, and a suspension," consistent with company policy, <u>see</u> Pltf.'s Compl., ECF No. 1, at para. 103; (2) more favorable treatment of a similarly situated heterosexual female who was not terminated for much worse misconduct,

para. 104, (3) amid a backdrop of anti-gay animus ("Frances!," "turn down the gay," your supervisor is just a "closet case"), para. 93-99.

Furthermore, Plaintiff "denied sleeping" in the Complaint, para. 88; Unemployment Compensation found that Plaintiff "did not knowingly or intentionally violate the employer's policies" and "there is no competent evidence in the record to support a finding of willful misconduct," para. 105; and the allegation of sleeping on the job (but somehow conspicuously "during a meeting") is alleged by Plaintiff to be "exaggerated." See id. at para. 101 and 106. To the contrary, Plaintiff worked with Defendant for more than a year and alleged in the Complaint that he was an "enthusiastic" employee "beloved by the Meadowview residents and patients." See id. at para. 88. These allegations combined with temporal proximity of about four (4) months are sufficient to establish a causal link for a *prima facie* case of retaliatory discharge.

Temporal proximity of four (4) months *plus* evidence of *both* intervening antagonism *and* pretext should be sufficient to demonstrate a causal link for purposes of a *prima facie* case of retaliatory discharge. This is especially the case on a motion to dismiss, which "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements." Phillips v. Cnty. of Allegheny, 515, F.3d 224, 234 (3d Cir. 2008).

> **C.     The Philadelphia Fair Practices Ordinance ("PFPO") Applies in This Case Because There Is Abundant Evidence That Defendant, WM Operating, LLC, Is Located in the City of Philadelphia, and That the Conduct at Issue in this Case Occurred in the City of Philadelphia.**

As Defendant, WM Operating, LLC, recognizes in its Motion to Dismiss, the Philadelphia Fair Practice Ordinance ("PFPO") covers any adverse employment action where "[t]he conduct took place in the **City of Philadelphia**." See Def.'s Mot. to Dismiss, at ECF No. 20, p. 14 (quoting § 9-1102(h) of the Philadelphia Code) (emphasis added). There is *no* similar

requirement in the language of the statute that the conduct also take place in the *County* of

Philadelphia.  In this case, there is abundant evidence that the conduct at issue took place in the

City of Philadelphia.  For example:

- When Defendant, WM Operating, LLC, incorporated itself and registered the

Meadowview name, it identified its principal office address, principal place of business,

commercial registered office provider, and even "venue" as being located in either the City or

County of Philadelphia, or both, to the Pennsylvania Department of State's Corporations Bureau

(see ECF No. 1, at para. 3-6); see also Entity Report, attached as Ex. "B;" Registration of

Fictitious Name, attached as Ex. "C;" Certificate of Organization for WM Operating, LLC,

attached as Ex. "D;" Screenshot of Business Corporation Search Result for Meadowview,

attached as Ex. "E;" Screenshot of Business Corporation Search Result for WM Operating, LLC,

attached as Ex. "F."

- When Defendant, WM Operating, LLC, previously operated under different

names – whether it was called "Integrated Health Services, Inc.," or "Rest Haven Nursing Center

(Whitemarsh), Inc." – the Defendant identified the address, city, and county of its commercial

registered office provider as Philadelphia.  See Consent to Use of Similar Name Form, attached

as Ex. "G"; see also Screenshot of Business Corporation Search Result for "Rest Haven Nursing

Center (Whitemarsh), Inc.," attached as Ex. "H."

- The original post office address of the initial registered office of the corporation,

and the address of the sole incorporator, was registered with the Pennsylvania Department of

State's Corporation Bureau as 1719 Packard Building, Philadelphia, PA 19102.  See Articles of

Incorporation, attached as Ex. "I."  Additionally, when the registered office for Defendant was

changed in 1985, the new registered office became 225 South 15th Street, Philadelphia, PA

19102, and the County was identified as Philadelphia.  See Change of Registered Office Form,

attached as Ex. "J."  The current registered office for this Defendant, under the active corporation

name, "Rest Haven Nursing Center (Whitemarsh), Inc.," is listed as being in the City and County

of Philadelphia.  See Dicennial Report of Association Continued Existence, dated 2011, attached

as Ex. "K."

- Defendant, Rest Haven Care Corp., is identified in official business and corporate documents as the "owner" of "Rest Haven Nursing Center (Whitemarsh), Inc.," which now operates as the Moving Defendant, WM Operating, LLC.  "Rest Haven Care Corp." is an active corporation that lists its business address, and the address of its first director and incorporator, as 1320 Two Penn Center Plaza, Philadelphia, PA, in the County of Philadelphia.  See Screenshots of Business Corporation Search Results for Rest Haven Care Corp., and Articles of Incorporation, attached collectively as Ex. "L."

- The President and CEO of Defendant, Premier Healthcare Management, LLC, Lisa M. Sofia, states that she is located in the "Greater Philadelphia Area" on LinkedIn.  See Ex. "M."  Premier Healthcare Management operates Meadowview as one of its facilities in its effort to be "the top healthcare employer in each and every community we serve."  See Website for Premier Healthcare Management, LLC, attached as Ex. "N."

- Defendant held itself out as being in the City of Philadelphia to current residents and patients on their activities calendars.  See, Pltf.'s Compl., at ECF No. 1, para. 14; see also Social Activities Calendar, at Ex. "O."

- Defendant held itself out to the community as being in the City of Philadelphia specifically to attract or gain business from residents or their families who lived in the City of Philadelphia.  See, Pltf.'s Compl., at ECF No. 1, para. 13, see also Google Search Result

Advertising "**Meadowview Rehabilitation and Nursing Center is a 244-bed facility located in Philadelphia, PA**," attached as Ex. "P."

- Defendant previously operated under the fictitious name, "Andorra Woods Healthcare Center," which is still an active fictitious name registered with the Commonwealth of Pennsylvania.  See Screenshot of Business Corporation Search Result for Andorra Woods Healthcare Center, attached as Ex. "Q."  Defendant previously operated under this name to attract or gain business from Andorra, which is a section or neighborhood of Philadelphia.  See Map of Andorra, Philadelphia, attached as Ex. "R."

- A Google map search returns that Defendant is located in "Philadelphia, PA" when anyone searches for the Defendant's business address – whether it be an employee, a potential resident or patient, a family member visiting a resident or patient, or anyone at all who visits Defendant.  See 'Google Maps' Screenshots of Defendant, attached as Ex. "S."

- A visit to the area in question reveals a sign, "Welcome to Philadelphia."  See Photograph, attached as Ex. "T."

- Defendant posted two signs advertising the facility in question, which are located in Philadelphia County, pointing directly to what a third sign identifies as the entrance of the facility in question nearby.  One of the signs in Philadelphia County is nailed to a street post.  You are required to then physically enter Philadelphia County to go through the entrance to the facility in question.  See Pltf.'s Compl., at ECF No. 1, para. 10-12; see also Photographs of Area, attached collectively as Ex. "U."

- Plaintiff, in his role as Activities Director, took residents across the street (Northwestern Avenue) to the Friendly's restaurant, located in Philadelphia County, for activities that were a requirement of Plaintiff's regular job duties.  See Pltf.'s Compl., at ECF No. 16; see

<u>also</u> Photograph of Area, attached as Ex. "V." Plaintiff contends he was, in fact, employed by Defendant in Philadelphia County. Defendant Meadowview asks Your Honor to rule that Plaintiff is protected as LGBT some part of his workday on one side of Northwestern Avenue, and then for the other part of the workday Plaintiff is not protected as LGBT across the street.

It should be noted that the above documents are "integral to . . . the complaint," and therefore "may be considered without converting the motion to dismiss into one for summary judgment." <u>In re Aetna Ins. Sec. Litig.</u>, 617 F.3d 272, 285 n.12 (3d Cir. 2010) (quoting <u>In re Burlington Coat Factory Sec. Litig.</u>, 14 F.3d 1410, 1426 (3d Cir. 1997) ("the primary problem raised by looking to documents outside the complaint – lack of notice to the plaintiff – is dissipated where plaintiff has actual notice and has relied upon these documents in framing the complaint" )); <u>see also</u> <u>Feinstein v. St. Luke's Hosp.</u>, No. 10-cv-0450, 2011 U.S. Dist. LEXIS 121191 *1, *11 (E.D. Pa. Oct. 9, 2011).

Even though Defendant, WM Operating, LLC, straddles the Philadelphia-Montgomery County Line, this Defendant is located in the City of Philadelphia, and the conduct at issue in this case occurred in the City of Philadelphia. The Defendant is holding itself out as being in the City of Philadelphia to attract and gain business directly from the City of Philadelphia, but simultaneously refusing to abide by the City of Philadelphia's LGBT-inclusive anti-discrimination law. It cannot do both.

> **D.    The Whitemarsh Township Human Relations Ordinance Applies in This Case Because There Is Abundant Evidence That Defendant, WM Operating, LLC, Is Located in Whitemarsh Township, and That the Conduct at Issue in <u>this Case Occurred in Whitemarsh Township.</u>**

As Defendant, WM Operating, LLC, itself further recognizes in its Motion to Dismiss, the Whitemarsh Township Human Relations Ordinance covers any employer "within the jurisdiction of **the Township**," with "the Township" further defined as "**the Township of**

**Whitemarsh**, Montgomery County, Pennsylvania." <u>See</u> Def.'s Mot. to Dismiss, at ECF No. 20, p. 16 (emphasis added).  In this case, there is also abundant evidence that the employer is actually located in "Whitemarsh Township, Montgomery County," and that the conduct in this case occurred in "Whitemarsh Township, Montgomery County" including, for example:

- Meadowview Rehabilitation and Nursing Center identifies on its website that it is located in "Whitemarsh, PA." <u>See</u> Screenshot of Meadowview Website, attached as Ex. "W."

- Defendant previously operated under three different fictitious names, all at Defendant's current address.  All three fictitious names included the term, "Whitemarsh," in the corporate name itself – Rest Haven Nursing Center (**Whitemarsh**), Inc.; Rest Haven – **Whitemarsh** Nursing Center; and Integrated Health Services at **Whitemarsh**.  <u>See</u>, <u>e.g.</u>, Consent to Use of Similar Name Form, attached as Ex. "G"; Screenshots of Business Corporation Search Result for Rest Haven – Whitemarsh Nursing Center, attached as Ex. "X;" Application for Registration of Fictitious Name for Integrated Health Services at Whitemarsh, attached as Ex. "Y." Therefore, "**WM**" Operating is likely an abbreviation for "Whitemarsh."

- The fictitious names, "Rest Haven – Whitemarsh Nursing Center" and "Andorra Woods Healthcare Center," identified at the Defendant's corporate address, 9209 Ridge Pike, both identify their address and principal place of business address as being located in "Whitemarsh, PA."  <u>See</u> Ex. "X."

- When Defendant previously registered itself as "Integrated Health Services at Whitemarsh," the Defendant listed the City as Whitemarsh.  <u>See</u> Ex. "Y."

- The Defendant, Rest Haven Nursing Center (Whitemarsh), Inc., is listed on Plaintiff's W2 Statement and his paycheck as being located at Defendant's address in "Whitemarsh, PA."  <u>See</u> Redacted W2 Statement, attached as Ex. "Z."

27

•    Defendant, Premier Healthcare Management, LLC, which owns and operates

Meadowview at the New York address listed on another of Plaintiff's W2 Statements, identifies

on its website that the facility is located in "Whitemarsh, PA."  See Ex. "N," at p. 2.

Defendant, WM Operating, LLC, straddles the line between the City of Philadelphia and

Whitemarsh Township.  Defendant is considered to be located in Whitemarsh Township and the

conduct at issue in this case can be considered to have occurred in Whitemarsh Township.

### E.    The New York State Human Rights Law Applies in This Case Because There Is Evidence That Defendant, WM Operating, LLC, Is Headquartered In New York, Or Is a Joint Employer, Agent, and/or Ostensible/Apparent Employer With Defendant, Premier Healthcare Management, LLC, In New York.

Preliminarily, it should be noted that Plaintiff alleges that WM Operating, LLC, is (1) a

joint employer or co-employer along with Premier Healthcare Management, LLC; that (2) WM

Operating is the agent of Premier; and/or (3) that each is an apparent or ostensible employer of

the Plaintiff.  See Pltf.'s Compl., at ECF No. 1, para. 35, 40-41.

"The definition of 'employer,' like the rest of Title VII, is given a liberal construction in

order to effectuate the statute's remedial purpose."  Vegh v. Gen. Elec. Co., No. 83-744, 1983

U.S. Dist. LEXIS 16885 *1, *3 (E.D. Pa. May 18, 1983) (Vanartsdalen, J.); see also Baker v.

Stuart Broad Co., 560 F.2d 389, 391 (8th Cir. 1977).  First, a "joint employer" or "co-employer"

is found where "one employer while contracting in good faith with an otherwise independent

company, has retained for itself sufficient control of the terms and conditions of employment of

the employees who are employed by the other employer."  Myers v. Garfield & Johnson Enters.,

Inc., 679 F. Supp. 2d 598, 607 (E.D. Pa. 2010) (Yohn, J.) (quoting NLRB v. Browning-Ferris

Indus. of Pa., 691 F.2d 1117, 1123 (3d Cir. 1982)).  Second, the "agency theory" is "where a

plaintiff's employer acts as the agent of another entity for employment purposes," retaining a

"right to control the employee's conduct, either directly or through the third party's control over

28

the employer." <u>Myers</u>, 679 F. Supp. 2d at 611. Third, an "apparent or ostensible employer" is where a defendant "held itself out to be plaintiff's employer" or the "plaintiff believed" the defendant "or its employees to be agents" of the employer "with the authority to create an employment relationship" with the employer. <u>Id.</u> at 613.

With this background in mind, the evidence which supports New York jurisdiction is also substantial:

- The corporate address for Defendant, WM Operating, LLC, which is listed on Plaintiff's W2 Statement, is also the corporate address for Defendant, Premier Healthcare Management, LLC. That corporate address is listed as 199 Community Drive, Great Neck, NY 11021 according to the W2 Statement from WM Operating, LLC. <u>See</u> Plaintiff's W2 Statement, attached as Ex. "AA;" <u>see also</u> New York State Business Entity Information for Premier Healthcare Management, LLC, attached as Ex. "BB."

- Premier Healthcare Management, LLC, identifies on its website that it should be contacted at 199 Community Drive, Great Neck, NY 11021. <u>See</u> Ex. "N," at p. 1. Premier offers to be the "the top healthcare employer in each and every community we serve." <u>See id.</u>

- Premier Healthcare Management, LLC, also operates five (5) other nursing homes or rehabilitation facilities in New York. <u>See</u> Pltf.'s Compl., at para. 33; <u>see also</u> Premier Website, at Ex. "N," pp. 2-3.

- The organizer for Defendant, WM Operating, LLC, identified her address as being in Monsey, New York. <u>See</u> Certificate of Organization for WM Operating, LLC, attached as Ex. "D." The same organizer also incorporated Rest Haven Operating, LLC, and identified her address as being in Monsey, New York at that time also. <u>See</u> Certificate of Organization for Rest Haven Operating, LLC, attached as Ex. "CC."

- Premier Healthcare Management, LLC, is the joint employer or ostensible employer that operates Meadowview, and which controlled the conditions of employment including control over the terms of any employment agreement, employment of relatives, employment of relatives in positions of financial responsibility, and reasonable accommodations due to disability (all per the Meadowview employee handbook).  See Pltf.'s Compl., at para. 32; see also Premier Website, at Ex. "N," p. 2; Excerpts of Meadowview Employee Handbook, attached as Ex. "DD."

Plaintiff is employed by a joint employer or ostensible/apparent employer in Great Neck, New York (the "top employer in every community we serve").  Alternatively, Defendant WM Operating is an agent of Defendant Premier, who is vicariously liable for the conduct in this case. WM Operating and/or Premier are headquartered in, controlling the conditions of Plaintiff's employment in, and paying Plaintiff per his W2 Statement, from an address in Great Neck, New York.  Yet, at the same time, WM Operating claims it is not subject to New York's LGBT-inclusive anti-bias law.  The New York State Human Rights Law should apply to this case.

**F.     Plaintiff's 'Sexual Orientation' Discrimination Claim Under the Springfield Township Human Relations Ordinance Was Administratively Exhausted In a Timely Manner.**

**1.     Plaintiff should be treated as having dual-filed/cross-filed with Springfield Township when he filed with the EEOC and/or PHRC**

Filing a charge of discrimination with the EEOC or another local agency simultaneously operates to satisfy the exhaustion requirement under the Springfield Township Human Relations Ordinance, as the claims under the Springfield Township ordinance "are predicated upon the same facts as the claims" in the original EEOC or local agency charge.  See Vandegrift v. City of Phila., No. 16-2999, 2017 U.S. Dist. LEXIS 3920 *1, *30 (E.D. Pa. Jan. 11, 2017) (holding that the plaintiff's "dual-filing of her charges of discrimination with the EEOC and the Pennsylvania

Human Relations Commission satisfied the Philadelphia Ordinance exhaustion requirement because her claims under the Philadelphia Ordinance are predicated upon the same facts as the claims in her EEOC charges"); <u>see also</u> <u>Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 925 (3d Cir. 1997); <u>Antol v. Perry</u>, 82 F.3d 1291, 1296 (3d Cir. 1996); <u>Ives v. NHS Human Servs., Inc.</u>, 2016 WL 4039644 *1, *3 (E.D. Pa. July 28, 2016) (Joyner, J.); <u>Ahern v. Eresearch Tech., Inc.</u>, 2016 WL 4501648 *1, *2-3 (E.D. Pa. Apr. 29, 2016); <u>Howze v. Jones & Laughlin Steel Corp.</u>, 750 F.2d 1208, 1212 (3d Cir. 1984); <u>Riley v. Wal-Mart Stores</u>, 2009 WL 3166279 *1, *3 (W.D. Pa. Sept. 28, 2009).

In this case, Plaintiff first filed with the City of Philadelphia Commission on Human Relations ("PCHR"), and dual-filed/cross-filed with the federal Equal Employment Opportunity Commission ("EEOC"), in a prompt and timely manner on November 29, 2016, which was just over <u>one (1) month</u> following his termination on September 22, 2016.  <u>See</u> Philadelphia Commission on Human Relations Complaint, dated November 29, 2016, attached as Ex. "EE;" <u>see also</u> PCHR Intake Questionnaire, attached as Ex. "FF."  This also operated to dual-file or cross-file the Plaintiff's complaint with Springfield Township in a prompt and timely manner as a matter of law, on that date, November 29, 2016.  Alternatively, when Plaintiff learned he might be in the wrong forum in Philadelphia, he again filed an EEOC Charge and cross-filed/dual-filed a Charge with the Pennsylvania Human Relations Commission ("PHRC"), on March 29, 2017, which also operated to dual-file or cross-file his Charge with Springfield Township as of that date, March 29, 2017.  <u>See</u> Second EEOC Charge of Discrimination, and Pennsylvania Human Relations Commission ("PHRC") Dual-File/Cross-File Election Form, dated Mar. 29, 2017, attached collectively as Exhibit "GG."

### 2.   Alternatively, Plaintiff filed his administrative complaint timely, but in the wrong forum

The Third Circuit has recognized that a court should permit equitable tolling of the statute of limitations for a discrimination claim when the plaintiff has "timely asserted his rights mistakenly in the wrong forum." Jones v. Morton, 195 F.3d 153, 159 (3d Cir. 1999); see also Seitzinger v. Reading Hosp. & Med. Ctr., 165 F.3d 236, 240 (3d Cir. 1999); Carter v. Keystone, 360 Fed. Appx. 271, 272-73 (3d Cir. 2010); Etienne v. Sobina, No. 10-5522, 2011 U.S. Dist. LEXIS 88786 *1, *10 (E.D. Pa. Aug. 10, 2011).

Plaintiff first filed with the City of Philadelphia Commission on Human Relations ("PCHR") within about (1) month of his termination in a prompt and timely manner. See Exs. "EE" and "FF." Plaintiff did so because, based on WM Operating's representations including on nearly all of its official forms and corporate documents, it held out that it was located in the City of Philadelphia. Other documents filed with the Pennsylvania Department of State, and representations made online, suggested WM Operating was actually located in Whitemarsh Township. When Plaintiff discovered he might be in the wrong forum, he promptly corrected this and filed in Springfield Township.

On a related note, in this case, the City of Philadelphia Commission on Human Relations instructed the Plaintiff that, "We have no information and no jurisdiction regarding matters filed with the PHRC. The Fair Practices Ordinance provides in Section 9-1112(4) *"The Commission shall not accept a Complaint from any person who has filed with the Pennsylvania Human Relations Commission with respect to the same grievance."* You will need to contact the PHRC directly for information regarding matters that may have been filed with that agency." See E-mail from PCHR Deputy Director of Compliance Pamela Gwaltney to Plaintiff's Counsel, dated

April 17, 2017, attached as Ex. "HH"; see also PCHR Regulation 2.3(d) ("No Dual Filing With

PHRC"). The pertinent excerpt from the PCHR Regulations is attached hereto as Exhibit "II."

Once Plaintiff discovered that Defendants were challenging jurisdiction in the

Philadelphia Commission on Human Relations with a Motion to Dismiss for Lack of

Jurisdiction, Plaintiff promptly filed with the PHRC to preserve his state-law PHRA claim, the

PHRC accepted the Plaintiff's complaint, and in doing so the PHRC explicitly stated, "You filed

in the wrong forum and then filed with us when you became aware of it." See E-mail from

Intake Supervisor of Pennsylvania Human Relations Commission Joyce Jordan-Brown to

Plaintiff's Counsel, dated April 27, 2017, attached hereto as Ex. "JJ." The PHRC's reasoning is

a correct recitation of the law, which is equally applicable to Plaintiff's Springfield Township

complaint. Once Plaintiff discovered that the Defendants might not be located in Philadelphia,

and might not be located in Whitemarsh, Plaintiff filed promptly in Springfield to make sure he

exhausted his remedies before filing suit in federal court. In fact, Plaintiff alleged in detail in his

Complaint of Discrimination to Springfield Township:

. . .

7.     Within 180 days of my termination, I filed a Complaint with the Philadelphia

Commission on Human Relations ("PCHR"). I filed with the Philadelphia

Commission on Human Relations [] as soon as I could after my termination on

September 22, 2016. I filed my Complaint with the PCHR on November 29,

2016.

8.     On December 13, 2016, the Philadelphia Commission on Human Relations

responded that "the complaint has been submitted for docketing."

9.      On <u>February 14, 2017</u>, Respondent, WM Operating LLC d/b/a Meadowview Rehabilitation and Nursing Center, informed the Philadelphia Commission on Human Relations that they received my Amended Complaint on <u>February 13, 2017.</u>

10.     On <u>March 9, 2017</u>, my counsel requested the status of Respondent's Answer from the Philadelphia Commission on Human Relations, and received *no* response.

11.     On <u>March 17, 2017</u>, my counsel again requested the status of Respondent's Answer from the Philadelphia Commission on Human Relations, and did not receive a response until <u>March 20, 2017</u>.

12.     On <u>March 20, 2017</u>, the City of Philadelphia Commission on Human Relations replied:  "Consistent with Section 2.4 of PCHR regulations, for good cause, the Commission may grant an extension for the submission of the answer beyond 28 days.  In this instance, the Commission approved the submission of the Answer in this matter to be on or before <u>March 27, 2017</u>."

13.     180 days from the date of my termination elapsed <u>March 21, 2017</u>.

14.     To my surprise, on <u>March 27, 2017</u>, Respondent, WM Operating LLC d/b/a Meadowview Rehabilitation and Nursing Center, filed a Motion to Dismiss for Lack of Jurisdiction in the City of Philadelphia Commission on Human Relations, and asserted for the first time that jurisdiction was proper in Whitemarsh Township.

15.     On <u>April 17, 2017</u>, I filed a Complaint with the Whitemarsh Township Human Relations Commission.  That same day, the Solicitor of Whitemarsh Township

notified my counsel that, contrary to any representations made by Respondents, the facility at issue is not located in Whitemarsh Township.[3]

16.    I am therefore timely filing this Complaint in Springfield Township, in an abundance of caution, on <u>April 24, 2017</u>.

<u>See</u> Springfield Township Complaint of Discrimination, dated April 24, 2017, attached hereto as Ex. "KK," at para. 7-16.

Of note, the statute of limitations of 180 days expired while this case sat with the Philadelphia Commission unanswered. Defendants requested an extension of time to answer beyond the 180-day statute of limitations, which the agency granted despite Plaintiff's knowledge. Then, Defendants filed a Motion to Dismiss for Lack of Jurisdiction, in which Plaintiff first learned he may be in the wrong forum. However, by the time that Defendants filed their Motion to Dismiss for Lack of Jurisdiction in the Philadelphia Commission, 180 days had already elapsed. Therefore, it was impossible for Plaintiff to file timely in Springfield within 180 days of his termination under any circumstance. What matters is that Plaintiff filed in Springfield promptly when he learned he was in the wrong forum (after going to Philadelphia and Whitemarsh). Defendants' Motion to Dismiss the Plaintiff's sexual orientation discrimination claim under the Springfield Township Human Relations Ordinance should be denied.

---

[3] The Defendants' Motion to Dismiss for Lack of Jurisdiction in the Philadelphia Commission is attached hereto as Ex. "LL," and the areas where Whitemarsh is referenced are highlighted and underlined.

III.    **CONCLUSION:**

For all of the foregoing reasons, Plaintiff, Frank "Doe," respectfully requests that this

Honorable Court deny the Defendants' Motion to Dismiss in its entirety.


Respectfully Submitted,

**POST & POST, LLC**

DATED:    _6/22/17_            BY:    _Justin F. Robinette_

JUSTIN F. ROBINETTE, ESQUIRE
Supreme Court I.D. No. 319829
920 Cassatt Road, Suite 102
200 Berwyn Park
Berwyn, PA 19312
Tel:  (484) 913-3034
Fax:  (610) 240-9185
E-mail:  jrobinette@postandpost.com
*Attorney for Plaintiff, Frank "Doe"*