IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FRANK "DOE" | : | CIVIL ACTION |
| | : | NO. 17-2204 |
| v. | : | |
| | : | |
| WM OPERATING, LLC d/b/a/ | : | |
| MEADOWVIEW REHABILITATION AND | : | |
| NURSING CENTER, et al. | : | |

O'NEILL, J.                                                                                              August 7, 2017

## **MEMORANDUM**

Plaintiff Frank "Doe" [1] brings claims of sex discrimination against his former supervisor and three companies that he argues were his co-employers under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.*, the Pennsylvania Human Relations Act, 43 Pa. Stat. Ann. § 951 *et seq.* and various local ordinances and the New York State Human Rights Law, N.Y. Exec. Law § 296. He alleges that, upon discovering he was gay, his supervisor mocked him by calling him by a woman's name in a high-pitched voice and then, after several months, fired him on false pretenses. Defendants move to dismiss.

I will deny defendants' motions in most respects: I find that plaintiff states a viable claim of sex-stereotyping under Title VII; I also find that plaintiff is entitled to discovery with respect to which company or companies acted as his employer and which local jurisdiction encompasses the nursing home. I will, however, dismiss plaintiff's claims under the New York State Human Rights Law, as plaintiff does not allege that any relevant conduct occurred in New York.

---

[1] Plaintiff has filed a motion to proceed anonymously in order to keep private the fact that he is gay.

## BACKGROUND

This case arises from defendant John Chapman's repeated mocking of plaintiff Frank "Doe," an employee under his supervision. Plaintiff began working as an activities director for the Meadowview Rehabilitation and Nursing Center, a nursing home in Pennsylvania, in May 2015. Compl. ¶ 47. In February the following year, the nursing home hired Chapman. Id. ¶¶ 49, 50. Around that time, two of plaintiff's coworkers warned him that he should not "act gay" around Chapman, one of them telling him to "turn down the gay." Id. ¶¶ 51, 52.

Chapman nonetheless "discovered [plaintiff] was gay in February 2016" and "repeatedly mocked [him] by referring to him by the female name, 'Frances,' instead of [plaintiff's] real name, 'Frank'" with a high-pitched, effeminate intonation. Id. ¶¶ 53, 54. Plaintiff repeatedly told Chapman to stop, but he did not. Id. ¶ 55.

Around May 2016, Chapman asked plaintiff privately whether plaintiff thought Chapman did not like him. Id. ¶ 57. Plaintiff "responded that he believed Mr. Chapman had a problem with gay people in general. Mr. Chapman raised his hand in the air, dropped it in his lap and said, 'Frances!' in a high-pitched, dramatic fashion." Id. After this conversation, Chapman did not stop mocking plaintiff by calling him "Frances," and did so in front of his coworkers to embarrass him. Id. ¶¶ 58, 59.

On September 22, 2016, Chapman told plaintiff that he had seen him sleeping during a staff meeting the day before, and fired him. Id. ¶¶ 60, 61. This was an "exaggerated and completely fabricated reason" that Chapman allegedly used as a pretext to fire plaintiff. Id. ¶ 66. Meadowview did not offer plaintiff the progressive discipline it routinely offered its other employees, which would have required a verbal warning, four written warnings and then suspension before termination. Id. ¶ 63. Plaintiff also alleges he was "qualified for the position,

satisfactorily performed in the position for 1 year and 4 months before he was terminated, and was an enthusiastic employee who was beloved by the Meadowview residents and patients he served." Id. ¶ 88.

Plaintiff has exhausted his administrative remedies with the Equal Employment Opportunity Commission and now brings this lawsuit against Chapman, WM Operating, LLC doing business as Meadowview Rehabilitation and Nursing Center, Premier Healthcare Management, LLC, which plaintiff alleges owns Meadowview, and the two companies listed on his paycheck—Rest Haven Care Corp., doing business as Rest Haven-Whitemarsh Nursing Center, and Rest Haven Nursing Center (Whitemarsh), Inc.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted." Typically, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," though plaintiff's obligation to state the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)." Id. (citations omitted). A well-pleaded complaint may not be dismissed simply because "it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Id. at 556. However, a complaint must provide "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. Id. at 556. In reviewing a complaint on a motion to dismiss, "the factual and legal elements of a claim should be separated," and while all well-pleaded facts

should be accepted as true, the court "may disregard any legal conclusions." Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

**DISCUSSION**

I. **Discrimination and Retaliation under Title VII and the PHRA**

Plaintiff brings claims for discrimination and retaliation under Title VII and the PHRA. Because these two statutes are interpreted coextensively, my discussion of Title VII below applies equally to the PHRA. Fogleman v. Mercy Hosp., 283 F.3d 561, 567 (3d Cir. 2002) ("[T]he PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."). I will deny defendants' motions with respect to both his discrimination and retaliation claims.

A. **Discrimination Based on Sex**

Defendants argue that plaintiff's claim for wrongful discharge and hostile work environment under Title VII should be dismissed because he alleges discrimination on the basis of sexual orientation only, not on the basis that his conduct did not conform to stereotypes of masculinity. Because I find, however, that plaintiff describes himself as the victim of antagonistic treatment due to his perceived effeminate behavior, rather than as a result of his sexual orientation alone, I will deny the motion to dismiss plaintiff's discrimination claims.

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "because of" a person's "race, color, religion, sex, or national origin . . . ." 42 U.S.C. § 2000e-2(a). Discrimination because of sex includes discrimination on the basis of a person's failure to conform to stereotypes associated with his or her sex. Prowel v. Wise Bus. Forms, Inc., 579 F.3d 285, 289–92 (3d Cir. 2009), citing Price Waterhouse v. Hopkins, 490 U.S. 228, 250–51 (1989).

4

Although the Court of Appeals has held that Title VII does not prohibit discrimination based on sexual orientation alone, Bibby v. Phila. Coca Cola Bottling Co., 260 F.3d 257, 261 (3d Cir. 2001), a plaintiff can state a Title VII claim if he alleges that he was discriminated against because a supervisor perceived that he defied sex stereotypes, even if he also alleges that he was discriminated against for being gay. Prowel, 579 F.3d at 291.

It is not a bar to a sex discrimination claim that the supervisor associated the plaintiff's behavior with being gay as well as with defying sex stereotypes. In Prowel v. Wise Business Forms, Inc., the Court of Appeals reversed the district court's grant of summary judgment for the defendant on the plaintiff's sex discrimination claim. Id. The Court relied on the plaintiff's evidence that, in addition to being discriminated against for being gay, he was also discriminated against because he had a high voice, did not curse, was "well-groomed," wore "dressy clothes," was neat, filed his nails, crossed his legs "the way a woman would sit," walked and carried himself in an effeminate manner, drove a clean car, talked about art, music, and interior design and moved with "pizzazz." Id. at 287. Thus, under Prowel, Title VII's prohibition on sex discrimination covers harassment for an employee's nonconformity with sex stereotypes, as distinct from his nonconformity with attitudes about sexual orientation. Id. at 289–90; see also Ellingsworth v. Hartford Fire Ins. Co., No. 16-3187, 2017 U.S. Dist. LEXIS 42061 (E.D. Pa. 2017) (holding that plaintiff alleged a Title VII claim for sex discrimination where she alleged "she was harassed because of her masculine—according to [her supervisor]—tattoo, how she dressed, how she looked, and how she presented herself as a woman"); Burnett v. Union R.R. Co., No. 17-101, 2017 U.S. Dist. LEXIS 97825 at *10–12 (W.D. Pa. June 26, 2017) (holding that the plaintiff stated a claim under Title VII because he alleged he was "harassed for not performing stereotypical male behavior").

Plaintiff has sufficiently alleged that he was discriminated against because Chapman perceived that he did not conform to Chapman's expectations of what is masculine. According to the complaint, Chapman apparently found plaintiff to be effeminate, using both a female name, "Frances," to refer mockingly to plaintiff, and a feminine, high-pitched voice when referring to him by this name. Plaintiff shows that Chapman harassed and, ultimately, fired plaintiff because of his failure to conform to sex stereotypes.

Although plaintiff does not allege that he actually acted effeminately, the absence of such an allegation does not doom his claim. Rather, he must merely show that he was perceived to be a member of a protected category. Price Waterhouse, 490 U.S. at 258 ("It is not our job to review the evidence and decide that the negative reactions to [the plaintiff] were based on reality; our perception of [the plaintiff's] character is irrelevant." The issue is rather "whether the [hiring partners who employed her] reacted negatively to her personality because she is a woman."). Plaintiff's complaint sufficiently alleges that Chapman perceived him to be effeminate.

Therefore, I will not dismiss plaintiff's claims for sex discrimination based on a hostile work environment and wrongful discharge on this basis.

### B. Retaliation

Plaintiff also states a claim under Title VII for retaliation.

> To establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.

Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006).

Plaintiff sets forth sufficient facts to satisfy the first two elements of his prima facie case. First, he alleges that he engaged in a protected activity by repeatedly asking Chapman to stop

6

harassing him, thereby opposing Chapman's unlawfully hostile conduct. Compl. ¶ 55.[2] Second, it is clear that Meadowview took an adverse employment action against plaintiff when it fired him in September 2016.

Plaintiff has also satisfied the third element by showing a causal connection between his participation in the protected activity and the adverse action. To allege a causal connection, a plaintiff must describe facts showing that the harm would not have occurred in the absence of the plaintiff's protected activity. Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2525–34 (2013). A plaintiff can show a causal connection in myriad ways, including temporal proximity between the employee's protected activity and the alleged retaliatory action, a pattern of antagonism following the protected conduct and preceding the adverse employment action, an employer's providing inconsistent reasons for terminating the employee, or other circumstantial evidence that supports the inference. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280–81 (3d Cir. 2000).

Plaintiff has alleged sufficient facts to show a causal connection between his opposition to Chapman's harassment and his termination. Although he was not terminated until several months after he asked Chapman to stop harassing him, he alleged continued harassment in the interim, that he was fired on false pretenses and that he was not given the progressive discipline given to other employees. These allegations are sufficient at this stage to survive a motion to dismiss on his retaliation claim.

---

[2] The parties do not discuss this basis for plaintiff's retaliation claim. Rather, plaintiff states that he was fired "in retaliation for his protected conduct of complaining about/opposing Mr. Chapman's dislike of gay people in or around May 2016." Id. ¶ 107. If this were the only allegation that he engaged in an activity protected by Title VII, I would be faced with a challenge to the controlling precedent in Bibby that sexual orientation discrimination is not protected under Title VII. 260 F.3d at 261. However, plaintiff also alleges that he repeatedly asked Chapman to stop harassing him—activity that is protected under Prowel. 579 F.3d at 289–92.

7

## II. Springfield Township Ordinance

Plaintiff also brings a claim under the Springfield Township Human Relations Ordinance (Counts VIII and IX), which prohibits employment discrimination on the basis of an individual's sexual orientation. Defendants argue this claim should be dismissed as untimely because a complaint alleging violations of the Ordinance "must be received by the Township within 180 days of the occurrence of the last act giving rise to the complaint, or such complaint shall be dismissed as untimely." Springfield Township Human Relations Ordinance, § 47-1 *et seq.*, Dkt. No. 20, Ex. 9. Springfield Township did not receive plaintiff's complaint until 214 days after the last act. Dkt. No. 20, Ex. 10 (Letter from Donald E. Berger, Jr., Township Manager, to Justin F. Robinette, May 12, 2017).[3] Plaintiff argues his tardiness should be excused because he timely asserted his rights mistakenly in Philadelphia and Whitemarsh before learning that the Meadowview nursing home was in fact located in Springfield. I agree. Plaintiff has pleaded adequate grounds to find that equitable tolling applies to his claim such that it should not be dismissed as untimely.

"[E]quitable tolling is proper only when the principles of equity would make the rigid application of a limitation period unfair. This unfairness generally occurs when the petitioner has in some extraordinary way been prevented from asserting his or her rights." Jones v. Morton, 195 F.3d 153, 159 (3d Cir. 1999) (internal quotation marks, citations and alterations

---

[3] I take judicial notice of the date of plaintiff's filing of the complaint with Springfield Township, as such information is readily determinable from the Township's records. A fact is subject to judicial notice, and therefore can be considered on a motion to dismiss, if it "is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); Feingold v. Graff, 516 F. App'x 223, 225 (3d Cir. 2013). Courts will generally take judicial notice of governmental records. Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (explaining that courts "routinely take judicial notice of . . . governmental records").

8

omitted). Equitable tolling "may be appropriate if . . . the plaintiff has timely asserted his rights mistakenly in the wrong forum." Id. But he or she "must show that he or she exercised reasonable diligence in investigating and bringing the claims. Mere excusable neglect is not sufficient." Id. (internal quotations, citations, and alterations omitted). Although, "[a]s a general matter, the filing of an action in a court that clearly lacks jurisdiction will not toll the statute of limitations," where "the lack of jurisdiction in the state court was far from clear" equitable tolling may be appropriate. Walck v. Discavage, 741 F. Supp. 88, 91 (E.D. Pa. 1990) (applying equitable tolling to the plaintiff's claims when she filed in the wrong forum because the claims were based on injuries on a boat near the Delaware-Maryland border); see also Jurbala v. United States, No. 14-1238, 2015 U.S. Dist. LEXIS 33878 at *21 (M.D. Pa. 2015); Flores v. Predco Servs. Corp., No. 10-1320, 2011 U.S. Dist. LEXIS 83443 at *22–26 (D.N.J. 2011). Plaintiff bears the burden of showing that equitable tolling is warranted. Podobnik v. U.S. Postal Serv., 409 F.3d 584, 591 (3d Cir. 2005).

Plaintiff's complaint shows that he exercised reasonable diligence in investigating and bringing his claims and that he mistakenly brought them in the wrong forum due to the difficulty of ascertaining the appropriate jurisdiction. Meadowview is located on or very close to the Philadelphia-Montgomery County line. Compl. ¶ 10. Meadowview has a Philadelphia address and has asserted in state filings that it is in Philadelphia. Id. ¶¶ 4, 5, 10, 13. As plaintiff's counsel explains, plaintiff first filed with the City of Philadelphia Commission on Human Relations within about one month of his termination. Id. ¶ 7. After filing, he twice requested defendants' answer before the statute of limitations tolled. Id. ¶¶ 10–11. Defendants, however, did not contest the Philadelphia commission's jurisdiction until several months later, having obtained an extension for filing their answer. Id. ¶¶ 9–14. Defendants asserted that

9

Meadowview is located in Whitemarsh Township. Id. ¶ 14. A few weeks later, plaintiff's counsel filed a complaint with the Whitemarsh Township Human Relations Commission, but was told by the Township's Solicitor that Meadowview was not in Whitemarsh. Id. ¶ 15. A week later, plaintiff's counsel filed a complaint in Springfield Township. Id. ¶ 16.

These allegations show that plaintiff was diligent in bringing his claims but thwarted on several occasions by circumstances beyond his control. He has established, on the face of the complaint, that equitable tolling is appropriate. Therefore, I will not dismiss his claim under the Springfield Township Human Relations Ordinance.

### III. Philadelphia and Whitemarsh Ordinances

Plaintiff also brings sexual orientation discrimination claims under the Philadelphia Fair Practices Ordinance (Counts IV and V) and the Whitemarsh Township Human Relations Ordinance (Counts VI and VII). The Philadelphia Ordinance only covers conduct that took place in the City of Philadelphia. Phila. Code § 9-1100; PCHR Guide to Discrimination Complaints, 2. The Whitemarsh Ordinance covers any employer "within the jurisdiction of the Township [of Whitemarsh, Montgomery County, Pennsylvania]." Whitemarsh Human Relations Ordinance No. 911, Dkt. No. 20, Ex. 8. Defendants argue that plaintiff cannot state a claim under the ordinances because the nursing home where plaintiff worked was in neither the city of Philadelphia nor Whitemarsh Township, but in Montgomery County. However, I will decline to take judicial notice of the nursing home's location without the benefit of discovery.

In general, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. It may, however, consider "a document integral to or explicitly relied upon in the complaint," In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997), where it is "undisputedly authentic." In re Donald J. Trump Casino Sec. Litig., 7

F.3d 357, 368 n.9 (3d Cir. 1993); see also Feingold v. Graff, 516 F. App'x 223, 225 (3d Cir. 2013) (holding that, on a motion to dismiss, a court may consider a fact that is subject to judicial notice under Rule 201(b) of the Federal Rules of Evidence—i.e., "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). Although some courts have taken judicial notice of deeds, they typically take notice only of the deed's existence, not its contents. See, e.g., Lee v. Thornburg Mortg. Home Loans Inc., No. 14-602, 2014 U.S. Dist. LEXIS 137758, at *11 (N.D. Cal. Sep. 29, 2014); see also Doss v. Clearwater Title Co., 551 F.3d 634, 639 (7th Cir. 2008).

It remains "subject to reasonable dispute" that the entire nursing home property is located within Springfield Township. The parties' motions rely extensively on evidence extraneous to the pleadings. Most persuasively, defendants submit the deed of the Meadowview Nursing Home, which states that the property is in Springfield Township, Montgomery County. See Dkt. No. 20, Ex. 2. On a motion to dismiss, however, there is no assurance that this information is complete. Therefore, I will allow discovery with respect to Meadowview's location.

## IV.    Employment Relationship with Premier and the Rest Haven Defendants

Plaintiff brings all of his claims against both Premier Healthcare Management, LLC, the company that he alleges owns Meadowview and the Rest Haven defendants—Rest Haven Care Corp., doing business as Rest Haven-Whitemarsh Nursing Center, and Rest Haven Nursing Center (Whitemarsh), Inc. The companies argue that plaintiff fails to allege an employment relationship with them. I disagree.

11

In order to establish a Title VII claim for employment discrimination,[4] plaintiff must show that he was in an "employment relationship" with the defendant. Faush v. Tuesday Morning, Inc., 808 F.3d 208, 212 (3d Cir. 2015). An employment relationship exists where the hiring party has the "right to control the manner and means by which the product is accomplished." Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323 (1992); Faush, 808 F.3d at 213 ("Because Title VII's definition of 'employee' is . . . devoid of content, the common-law test outlined in Darden" determines its meaning). The right to control can be shown based on the a long list of nonexclusive factors, including "whether the work is part of the regular business of the hiring party," "whether the hiring party has the right to assign additional projects to the hired party," "the provision of employee benefits," "the extent of the hired party's discretion over when and how long to work" and "the tax treatment of the hired party." Darden, 503 U.S. at 323–24. Who had the authority to hire and fire the worker is also relevant. Faush, 808 F.3d at 214. Each of these factors must be weighed; there is "no shorthand formula or magic phrase that can be applied to find the answer." Id. Additionally, the inquiry is not comparative between two possible employers—"[t]wo entities may be 'co-employers' or 'joint employers' of one employee for purposes of Title VII" if they both meet the common law standard. Id. at 215.

Taking all of plaintiff's allegations as true, I hold that he has alleged facts satisfying enough of the Darden factors to show an employment relationship with both Premier and the Rest Haven Defendants.

**A.     Premier**

Plaintiff alleges that Premier owns and operates six nursing and rehabilitation facilities, Meadowview among them, showing that the work plaintiff did was in Premier's "regular

---

[4] Neither plaintiff nor the defendants argue that the law with respect to this issue is different under the relevant state and county laws and ordinances.

business." Compl. ¶¶ 7, 33. Premier also "operates a website for 'Meadowview Rehabilitation and Nursing Center." Id. ¶ 31. Plaintiff alleges that his tax treatment suggests Premier employed him: while his W2 stated that his employer was Rest Haven, the address and principal place of business was 199 Community Drive, Great Neck, NY 11021, which is Premier's address. Id. ¶¶ 19, 29, 30.

Additionally, Premier hired all Meadowview workers. Id. ¶ 31 (quoting the employee handbook, which states, "No representative of Meadowview, other than the CEO of Premier Healthcare Management, LLC, has the authority to enter into any agreement providing employment for a specific duration or to make any agreement contrary to this section of the handbook"). It also oversaw any disagreements about reasonable disability accommodations for employees. Id. ¶ 32. Plaintiff's employee handbook also references Premier Healthcare Management. Dkt. No. 33, Ex. I.[5] Finally, the CEO of Premier Healthcare Management registered the fictitious name, Meadowview Rehabilitation and Nursing Center, with the Pennsylvania Department of State. Id. ¶¶ 5, 6. Thus, the use of the Meadowview name in other areas could refer to Premier Healthcare.

Although, as Premier points out, plaintiff does not provide allegations with respect to several of the Darden factors, he need not do so in order to allege an employment relationship. While Premier contends that it is a "management company" and that "the Complaint makes it clear that Premier's regular business was solely administrative management," Dkt. No. 25 at 12, I would have to stray from the standard for a motion to dismiss to conclude from plaintiff's

---

[5] I may consider "a document integral to or explicitly relied upon in the complaint," In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426, where it is "undisputedly authentic." In re Donald J. Trump Casino Sec. Litig., 7 F.3d at 368. Though plaintiff only attaches the handbook as an exhibit in his response to defendants' motions to dismiss, he relies on it in his complaint and defendants do not dispute its authenticity.

13

complaint that Premier was solely involved in upper-level management and in no way controlled the manner in which plaintiff performed his work. Plaintiff has pleaded "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of" an employment relationship between himself and Premier. Twombly, 550 U.S. at 556. Therefore, I will not dismiss the claims against Premier at this stage.

### B. The Rest Haven Defendants

The Rest Haven defendants argue that they did not employ plaintiff during the relevant time period because they sold the nursing home before Chapman was hired and thus before the alleged misconduct began. This argument would be more appropriate after discovery with respect to Meadowview's sale and Chapman's hiring.

For the purposes of this motion, I must accept all of the following allegations as true: the employer name listed on plaintiff's paycheck at all times relevant to this action was "Rest Haven Nursing Center (Whitemarsh), Inc.," Compl. ¶ 19; and "Rest Haven Care Corp., made hiring decisions including hiring the Plaintiff, promulgated work rules, was responsible for addressing discrimination and harassment complaints, set conditions of employment, and was responsible for day-to-day supervision." Id. ¶ 39.

The Rest Haven defendants argue in their motion to dismiss that they sold the nursing home on February 1, 2016. They cite the Medicare.gov website, Dkt. No. 29, Ex. A, and an agreement showing that WM Operating leases the nursing home's premises. Id., Ex. B. The Rest Haven defendants contend these are public records of which the court may take judicial notice.

Taking judicial notice of this information,[6] I find that it does not conclusively establish that the Rest Haven defendants ceased employing plaintiff before any misconduct occurred. It shows merely that they did not own Meadowview. As recognized in Darden, many factors determine the existence of an employment relationship. Additionally, the information does not show whether it was the Rest Haven defendants or defendant WM Operating that hired Mr. Chapman in February 2016, the same month of the supposed sale. Compl. ¶ 49. Therefore, I will not dismiss the claims against the Rest Haven defendants, but rather will allow for discovery regarding whether Rest Haven hired Chapman and employed plaintiff during the relevant time.

## V. New York State Human Rights Law

The defendants move to dismiss plaintiff's claims under the New York State Human Rights Law (Count X and XI). The New York Human Rights Law prohibits any employer from discriminating based on sexual orientation. N.Y. Exec. Law § 296. Meadowview argues that these claims should be dismissed because Meadowview is not located in New York. Plaintiff responds that he has alleged that WM Operating, LLC's corporate address is in New York, as listed on Plaintiff's W2 statement. Dkt. No. 24, Ex. AA; Compl. ¶ 29. Regardless of

---

[6] A fact is subject to judicial notice, and therefore can be considered on a motion to dismiss, if it "is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); Feingold v. Graff, 516 F. App'x 223, 225 (3d Cir. 2013). Courts will generally take judicial notice of governmental records. Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (explaining that it was "clearly proper to take judicial notice" of documents retrieved from Medicare.gov and other state sites, explaining that courts "routinely take judicial notice of such governmental records"); see also Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998 (9th Cir. 2010) (taking judicial notice of a list of approved vendors on a school district website); Laborers' Pension Fund v. Blackmore Sewer Constr., Inc., 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice that one bank is a branch office of another bank). I will therefore take judicial notice of the fact that WM Holdings, LLC has owned one hundred percent of Meadowview Rehabilitation and Nursing Center since February 1, 2016, as stated in the Medicare.gov record attached to defendants' motion to dismiss, Dkt. No. 29, Ex. A.

defendant's corporate address, however, plaintiff has not stated a claim under the New York State Human Rights Law because he does not allege that any relevant conduct occurred in New York.

New York courts generally hold that laws regulating conduct only apply to conduct that occurs within the state. Cooney v. Osgood Mach., Inc., 612 N.E.2d 277, 282 (N.Y. 1993) (explaining that "the traditional rule of lex loci delicti almost invariably obtains" with respect to conduct-regulating laws). Thus, for laws regulating the way employers treat their employees, courts have applied the law of the state where the plaintiff was employed and fired, rather than the law of the state where the employer-corporation was headquartered. See, e.g., Duffy v. Drake Beam Morin, No. 96-5606 (MBM), 1998 U.S. Dist. LEXIS 7215, at *37 (S.D.N.Y. May 15, 1998) (explaining that "even if the decision to fire" the plaintiff was made at the defendant's New York City headquarters, "that fact is insufficient to establish a violation of the State Human Rights Law"); Littman v. Firestone Tire & Rubber Co., 709 F. Supp. 461, 469 (S.D.N.Y. 1989) (applying New Jersey law where the plaintiff was an employee and informed of his discharge in New Jersey).

The only connections to New York that plaintiff sets forth are the corporate addresses of defendants Premier Healthcare Management and WM Operating, LLC. He does not claim that any offending conduct occurred in New York, but rather alleges he worked exclusively in Pennsylvania, the harassment occurred in Pennsylvania and he was fired in Pennsylvania. Therefore, he cannot state a claim under a law that regulates conduct in New York. I will dismiss these claims.

## **CONCLUSION**

In light of the preceding discussion, I find that plaintiff has stated claims under Title VII, the PHRA and the local ordinances against defendants Chapman, WM Operating, LLC, Premier and the Rest Haven defendants. His claims under the New York Human Rights Law, however, will be dismissed for failure to set forth any New York based conduct.

An appropriate Order follows.